1  Whitney E. Street (CA Bar No. 223870)
**BLOCK & LEVITON LLP**
2  100 Pine Street, Suite 1250
San Francisco, CA 94111
3  Tel.: (415) 968-1852
Fax: (617) 507-6020
4  wstreet@blockesq.com
5
Gregory S. Asciolla (*pro hac vice application*
6  *forthcoming*)
**LABATON SUCHAROW LLP**
7  140 Broadway
New York, NY 10005
8  Tel: (212) 907-0700
Fax: (212) 818-0477
9  gasciolla@labaton.com
10
[Additional Counsel on Signature Page]
11
*Counsel for Plaintiffs BB&B Business Group*
12 *and Larry George Rightmyer II*
13

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| BB&B BUSINESS GROUP and LARRY GEORGE RIGHTMYER II, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>          v.<br><br>VITOL INC.; SK ENERGY AMERICAS, INC.; SK TRADING INTERNATIONAL CO. LTD.; DAVID NIEMANN; AND BRAD LUCAS,<br><br>                    Defendants. | **Case No.:**<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs BB&B Business Group and Larry George Rightmyer II (or "Plaintiffs"), on behalf of themselves and all others similarly situated, file this complaint against Vitol Inc., SK Energy Americas, Inc., SK Trading International Co. Ltd., David Niemann, and Brad Lucas (collectively "Defendants") for violations of the Cartwright Act (California Business and Professions Code section 16720 et seq.) and the Unfair Competition Law (California Business and Professions Code section 17200 et seq.). The allegations herein are based on Plaintiffs' personal knowledge as to their own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of its counsel.

## I.     INTRODUCTION

1.       In February 2015, an explosion rocked a large gasoline refinery complex located in Torrance, California. A key part of the refinery complex was badly damaged and needed extensive repairs. This accident caused an unexpected undersupply of refined gasoline in California, because that refinery supplied about ten percent of all the gasoline in the state.

2.       This supply disruption, which caused spikes in gasoline prices, created an opportunity for major gasoline trading firms to conspire to fix prices, including Defendants Vitol Inc. ("Vitol"), SK Energy Americas, Inc. ("SKEA"), and SK Trading International Co., Ltd. ("SKTI") (together, "SK"). Indeed, following the explosion, Vitol and SK, which had already begun to act in concert, quickly negotiated large contracts to supply much-needed gasoline and gasoline blending components for delivery in California. The largest of these contracts exceeded more than 10 million gallons. Rather than competing on the merits, though, Vitol and SK participated in a scheme to drive up and manipulate the spot market price for gasoline so that they could realize windfall profits on these large contracts to deliver gasoline and gasoline blending components.

3.       Beginning at least as early as the fall of 2014 and continuing into late 2016, the lead traders for both Vitol and SK, who were friends and former colleagues, reached agreements—with each other and with third parties—as part of a scheme to manipulate, raise, fix, and tamper with the spot market price of gasoline in California. Vitol and SK also entered

into agreements with each other to share the profits and to disguise or hide the nature of the scheme.

4.      Defendants Vital and SK may not have created the supply disruption that impacted California starting in February 2015, but they exacerbated the effects of that disruption to (illegally) enrich themselves at great cost to purchasers of gasoline in California.

5.      This conduct has not gone unnoticed by government officials. On May 4, 2020, the California Attorney General filed a complaint ("AG Complaint") in San Francisco Superior Court for violations of the Cartwright Act and the UCL.[1]

6.      As a result of Defendants' anticompetitive conduct, Plaintiffs and members of the Class have been injured in their business and property during the Class Period (defined below) by paying supracompetitive prices for gasoline in California. Plaintiffs seek relief under state antitrust and consumer protection laws.

## II.      JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) and 28 U.S.C. § 1367.

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), (c), and (d),  because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more Defendants reside in this District or is licensed to do business in this District. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal restraint of trade throughout this District. The anticompetitive conduct alleged herein has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

9.      This Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, or committed overt acts in furtherance of

---

[1] The AG Complaint is available at https://www.oag.ca.gov/system/files/attachments/press-docs/Scanned%20copy%20of%20redacted%20complaint%20as%20filed.pdf.

1    the illegal scheme throughout the United States, including in this District. The scheme and

2    conspiracy have been directed at, and have had the intended effect of causing injury to, persons

3    residing in, located in, or doing business throughout the United States, including in this District.

4    **III.    INTRADISTRICT ASSIGNMENT**

5             10.    Pursuant to N.D. Cal. Civil Local Rule 3-2 (c), assignment of this case to the San

6    Francisco Division of the United States District Court for the Northern District of California is

7    proper because the trade and commerce affected by Defendants' illegal conduct was substantially

8    conducted with, directed to or impacted Plaintiffs and members of the Class in counties located

9    within the Division. The San Francisco spot market is located within this Division.

10   **IV.    PARTIES**

11           **A.    Plaintiffs**

12           11.    Plaintiff BB&B Business Group has its principal place of business in California at

13   207 Wallace Avenue, Vallejo, CA 94590. Plaintiff purchased fuel at retail in California during

14   the Class Period, defined herein, for its own use and not for resale.

15           12.    Plaintiff Larry George Rightmyer II is a California resident whose address is

16   46143 Drymen Ave, Temecula, CA 92592. Plaintiff purchased fuel at retail in California during

17   the Class Period, defined herein, for his own use and not for resale.

18           **B.    Defendants**

19                  **1.    Vitol**

20           13.    Defendant Vitol, a Delaware corporation, is a multi-billion dollar privately-held

21   energy company with its principal place of business in Houston, Texas. Vitol Holdings B.V.,

22   founded in the Netherlands, is the world's largest independent oil trading house and is the

23   ultimate parent entity of Vitol. Vitol is registered with the California Secretary of State to

24   conduct business in California.

25                  **2.    The SK Defendants**

26           14.    Defendant SKEA is a California corporation with its head office at 11700 Katy

27   Freeway, Suite 900, Houston, Texas. SKEA is a wholly-owned subsidiary of SK Energy

28   International ("SKEI"). SKEI is a Singaporean corporation with its head office at 9 Straits View,

---

#12-07/12 Marina One West Tower, Singapore. SKEI is the parent entity of Defendant SKEA and is itself a wholly-owned subsidiary of Defendant SKTI.

15.     Defendant SKTI is a South Korean corporation with its head office at 26 Jongno, Jongno-gu, Seoul, South Korea. Defendant SKTI is the grandparent entity of Defendant SKEA and the parent entity of SKEIN. Defendant SKTI is a sister entity to SK Energy, also located in South Korea, which operates one of the largest oil refineries in the world.

16.     At all times relevant to this Complaint, Defendant SKEA was an agent and alter ego of Defendant SKTI, due to the nature and extent of control that SKTI exercised over SKEA.

17.     At all times relevant to this Complaint, there existed a unity of interest and ownership between the SK Defendants such that any separateness between them had ceased to exist, and SKTI controlled, dominated, managed, and operated SKEA to suit its convenience. Specifically, SKTI controlled the business and affairs of SKEA such that the distinction between the companies were mere technicalities.

18.     Additionally, at all times relevant to the Complaint, SKEA was acting within the course and scope of its agency with the knowledge, consent, permission, authorization, and ratification, either express or implied, of SKTI in performing the acts alleged in this Complaint.

### 3.     David Niemann

19.     During the relevant period, Defendant David Niemann was an executive of SK and was the senior trader responsible for executive trades on the U.S. West Coast, including in California. Niemann colluded with Brad Lucas from Vitol, as more fully alleged herein. On information and belief, David Niemann is a resident of Houston, Texas.

### 4.     Brad Lucas

20.     During the relevant period, Defendant Brad Lucas was an executive of Vitol. Lucas was the primary trader at Vitol with responsibility for trading gasoline and gasoline blending components that were delivered via pipeline within California. On information and belief, Brad Lucas is a resident of Houston, Texas. As alleged herein, Lucas and Niemann, along with others, colluded to increase the prices of gasoline in California.

## V.    BACKGROUND

### A.    California's Finished Gasoline Market

21.    California and the U.S. West Coast are geographically isolated from refining hubs in the rest of the United States. Indeed, while there are pipelines that connect California and other adjacent states, these pipelines only ship gasoline products *out of* California. There are no pipelines that ship finished gasoline products *into* California. Therefore, when local supplies are insufficient to meet demand in California, additional finished gasoline and gasoline blending components are typically brought into the state on marine vessels.

22.    Furthering its isolation with regard to its finished gasoline market, California's vehicle emissions standards—the California Reformulated Gasoline Blendstock for Oxygenate Blending ("CARBOB")—are more stringent than those of the rest of the country. Thus, gasoline used in neighboring states generally does not meet CARBOB specifications and cannot be used as a substitute source of supply. Non-CARBOB gasoline such as Reformulated Gasoline Blendstock for Oxygenate Blending ("RBOB") is generally less expensive to produce than CARBOB (but does not meet California's emissions standards).

23.    Most of the CARBOB consumed in California is produced locally by refineries located in clusters near metropolitan centers in Northern California and Southern California. Absent supply disruptions, California refineries have production capacities that meet or exceed statewide demand.

24.    Gasoline refineries are complex operations that require extensive maintenance on pre-planned or scheduled time intervals to assure operating reliability and to meet operating requirements. For scheduled maintenance, a gasoline refinery or parts of the refinery are shut down for what are referred to as "planned turnarounds." Planned turnarounds usually have little impact on the price of gasoline, as refineries build up inventories or arrange for alternate supply in advance of a planned turnaround to offset the reduced production during the shutdown period. "Unplanned outages," conversely, are unexpected problems that occur during refinery operations. During an unplanned outage, a gasoline refinery or parts of the refinery are shut down with little or no advance notice, and thus, there is an unanticipated reduction in the

1  production of that refinery without an offsetting buildup of supply; this can increase the price of

2  gasoline.

3     25. When unexpected supply disruptions occur, it can be difficult to find immediate

4  alternative sources of supply due to California's stringent CARBOB specifications and relative

5  geographic isolation. Market participants frequently turn to imports brought in by ship to make

6  up for shortfalls, but there can be a significant time lag due to transit time. For example, ships

7  carrying CARBOB or other blendstocks from refineries in Asia can take several weeks or more

8  to arrive in California.

9     **B.** **Spot Market Trading**

10      **1.** **Gasoline Spot Market Trading in California**

11     26. Market participants buy and sell gasoline for physical delivery within a short

12  timeframe on "spot markets." There are various spot markets in the United States in which

13  gasoline and other fuels are traded. Two of the spot markets are in California: one is in San

14  Francisco for delivery in Northern California; the other is in Los Angeles for delivery in

15  Southern California.

16     27. Spot markets are referred to as "'physical" markets because market participants

17  use them to obtain supplies of actual product. As a result, physical markets are located at or near

18  refinery hubs, and the trades consummated on the spot market designate a delivery location and

19  delivery timeframe. Spot market transactions that provide for nearly immediate delivery after the

20  execution of the trade are called "prompt" trades.

21     28. The prices on the two California spot markets are greatly influenced by the prices

22  on the New York Mercantile Exchange ("NYMEX"). The NYMEX is a futures market for

23  delivery of gasoline to New York Harbor. It is sometimes called a "paper market" rather than a

24  physical market because market participants close most futures transactions before making or

25  taking physical delivery. Prices on the NYMEX are determined in a centralized market: there are

26  typically thousands of gasoline trades on the NYMEX amounting to billions of gallons on every

27  trading day. Further, all transactions on the NYMEX are publicly reported, so pricing is

28  transparent to market participants.

29.     NYMEX prices are for RBOB, not CARBOB, so the California spot market price is usually, but not always, higher than the NYMEX. That difference in prices—referred to as a "spread," the "basis," or the "differential"—between CARBOB and RBOB, whether positive or negative, is expressed in cents per gallon.

30.     The NYMEX prices generally reflect large-scale national and international factors, while the California spot markets react to the NYMEX price as well as to regional and local supply and demand conditions. In many California spot market transactions, the buyer and the seller negotiate only the basis, which is what is added to or subtracted from the NYMEX price.

31.     Spot market deals in California generally range between 420,000 gallons (10,000 barrels) to 2.1 million gallons (50,000 barrels). The spot market price is the largest component of the price on the wholesale "rack market," which is typically sold in gasoline truck volumes of about 8,000 gallons (approximately 190 barrels). The price at the rack market is typically reflected in the retail price within a couple of days.

32.     There are two common grades of CARBOB consumed in California and traded on the spot market: regular CARBOB ("Regular"), which is the most commonly traded grade of gasoline, and premium CARBOB ("Premium"), which is traded with far less frequency and at a higher price.

33.     Alkylate is a high-quality gasoline blending component that can be combined with other blendstocks to create Regular and, more often, Premium.

**2.     Spot Market Price Reporting in California**

34.     Unlike the NYMEX, spot market trades in California for both Regular and Premium are traded through non-public transactions, sometimes called over-the-counter ("OTC") trades. These OTC transactions do not occur on a centralized open exchange like the NYMEX, so prices on the California spot markets are not immediately public. Instead, market participants rely on price-reporting services that report spot market prices from sources that participate in the market, such as traders, refiners, and brokers.

35.     The Oil Price Information Service, LLC ("OPIS") is the most widely used reporting service in California. OPIS is a subscription service that publishes a daily OPIS West Coast Spot Market Report (the "Spot Market Report"), which is the industry pricing benchmark used by both buyers and sellers in California. Subscribers to OPIS get the Spot Market Report and can also receive market updates from OPIS throughout the day, which include required deals and other industry news.

36.     Price reporting by OPIS plays a crucial role in certain types of gasoline contracts that use a "floating price" determined at a future date as indicated in the contract. The parties agree on a differential above or below the spot price or prices published by OPIS. These floating price contracts can be tied to the future price of Regular or Premium as reported by OPIS in the Spot Market Report.

37.     The future dates on which the floating price in the contract is set are often referred to as "pricing windows." The pricing window can be an agreed-upon date or a date range. Pricing windows can also be tied to the dates of delivery or other conditions as indicated in the contract.

38.     Market participants voluntarily submit information on their trades to OPIS, which calculates a daily spot price by, among other things, aggregating the reported trades. Therefore, the reporting of trades is a critical component of how OPIS calculates the daily spot prices.

39.     The Spot Market Report includes, among other gasoline products, the prices for Regular and Premium gasoline contracts for prompt (i.e., near term) delivery in Southern California and in Northern California. The Spot Market Report also contains forward prices for Regular and Premium delivery in upcoming future months.

40.     On a daily basis, there are usually many more Regular trades than Premium trades listed in the Spot Market Report. For example, there could be five, 10, 15, or more Regular trades reported on one day compared to one or no Premium trades. Because trading in Premium is less common than Regular, a single Premium trade reported to OPIS tends to have a bigger impact on the spot market price than a single trade of Regular.

### 3. Rules Governing Spot Market Trading in California

41. In California, fraudulent gasoline spot market trading is covered by California's commodities fraud statute. (Corp. Code § 29504 (defining "commodities")). Under the commodities fraud statute, when buying or selling commodity contracts, it is unlawful to engage in certain fraudulent acts. (*See* Corp. Code § 29536, subds. (a), (b), (c), (d)).

42. Specifically, under section 29536(c), it is unlawful to "[t]o willfully engage in any transaction, act, practice, or course of business which operates or would operate as a fraud or deceit upon any persons." (Corp. Code § 29536, subd. (c)).

43. In addition to the California commodities fraud statute, the federal Commodity Exchange Act makes unlawful certain types of "[p]rohibited transactions." (7 U.S.C. § 6c.) More specifically, the Commodity Exchange Act prohibits a transaction that "is, of the character of, or commonly known to the trade as, a "wash sale" or "accommodation trade." (7 U.S.C. § 6c(a)(2)(A)(i).)

44. The Commodity Exchange Act also prohibits a transaction that "is used to cause any price to be reported, registered, or recorded that is not a true and bona fide price." (7 U.S.C. § 6c(a)(2)(B).

## VI. DEFENDANTS' PARTICIPATION IN THE CALIFORNIA SPOT MARKET

### A. Vitol's U.S. West Coast Trading Operation

45. During the relevant period, Vitol was an active participant in trading gasoline in California. Vitol bought and sold spot market contracts for various types of fuel products, including Regular and Premium.

46. Vitol imported gasoline and gasoline blending components (such as alkylate) into California.

47. Vitol employee Brad Lucas ("Lucas") held the title USWC Trader. Lucas was the primary trader at Vitol with responsibility for trading gasoline and gasoline blending components delivered via pipeline within California.

48. Lucas reported to John Addison ("Addison"), a Vitol executive who in turn reported to the President of Vitol Americas. In addition to supervising Lucas, Addison also had

trading responsibility that included trading gasoline and gasoline blending components that were primarily delivered via marine vessels to locations in the U.S. West Coast, including California.

**B.     SK's U.S. West Coast Trading Operation**

49.     During the relevant period, SK was an active participant in trading gasoline in California. SK bought and sold spot market contracts for various types of fuel products, including Regular and Premium.

50.     SK imported gasoline and gasoline blending components (such as alkylate) into California.

51.     SKEA employee David Niemann ("Niemann") was the senior trader responsible for executing trades on the U.S. West Coast, including California. Another SKEA employee, Shelly Mohammed ("Mohammed"), held the role of gasoline scheduler and was Niemann's subordinate.

52.     SKEA functioned as the California trading arm of SKTI. While Niemann and Mohammed were nominally employees of Defendant SKEA, SK's U.S. West Coast Trading Operation was conducted within the continuous and pervasive control and supervision of SKTI, acting for itself and through its wholly-owned subsidiary, SKEI.

53.     As discussed in more detail below, SKTI also specifically reviewed and approved key decisions to coordinate certain trading activities with Vitol.

**C.     Defendants' Anticompetitive Conduct**

**1.     Vitol and SK Begin Coordinating Even Before the Explosion**

54.     Starting or around November 1, 2014, Vitol and SK reached an agreement to coordinate or cooperate in regards to certain trading activities on the United States West Coast, including activity in California. Vitol and SK took steps to conceal the nature of these agreements from other market participants.

55.     Notably, SK hired Niemann in August 2014, and Niemann immediately began trading gasoline contracts on the California spot market. Before being hired by SK, Niemann held a similar role at Vitol for approximately ten years. Niemann and Lucas overlapped at Vitol, and even after leaving Vitol, Niemann maintained connections with Lucas and others at Vitol.

56.     When Vitol and SK started conspiring in late 2014, there was ample supply in the California market, and spot market prices for Regular were at or below the NYMEX price for RBOB for much of November and December 2014.

57.     At some point in February 2015, Lucas and Niemann expanded the conspiracy to include Premium.

58.      By February 2015, Niemann was the senior trader for SK with responsibility for California trading, Lucas had the same role with Vitol, and their respective firms were competitors in the California gasoline market.

59.     For the duration of the scheme alleged more fully below, Lucas of Vitol and Niemann of SK conspired with each other and reach agreements through multiple means of communications, including instant messaging, emails, and telephone calls, as well as in-person meetings, dinners, and drinks.

60.     While it may have appeared to market participants that Vitol and SK were competitors, in fact the two companies were working together. Despite the terminology used, their "joint ventures," described more fully below, were a sham or pretext for the two to conspire and were a method of engaging in prearranged transactions and avoiding competition.

## VII.   DEFENDANTS' CONSPIRACY EXPANDED FOLLOWING THE FEBRUARY 2015 EXPLOSION AT THE TORRANCE REFINERY

### A.     The Explosion

61.     During the morning hours of February 18, 2015, there was a large explosion at the Torrance Refinery, one of the largest refineries in Southern California, which, at the time, was owned by Exxon Mobil Corp. ("ExxonMobil"). The Torrance Refinery produces approximately 20 percent of all of the gasoline sold in Southern California (and ten percent of the statewide supply).

62.     The blast, which caused significant damage to the refinery and was felt in the surrounding community, occurred in the fluid catalytic cracking ("FCC") unit—a key part of a refinery complex that produces gasoline and related high-value products like alkylate. The Torrance Refinery's FCC unit was particularly important because it produced a significant

1   portion of all the high-octane alkylate produced in California. Thus, the alkylate produced at the

2   Torrance Refinery was a key gasoline blending component for Premium produced in California.

3       63.    The Torrance Refinery immediately shut down the FCC unit and reduced

4   production of gasoline products, including alkylate, as repair efforts and a federal investigation

5   into the explosion commenced. As a result of this unplanned outage at the Torrance Refinery,

6   ExxonMobil needed to replace a significant amount of lost gasoline and alkylate production in

7   Southern California to fulfill its supply needs.

8       **B.    The Scheme to Fix and Manipulate the California Spot Market Price**

9       64.    Following the explosion, and after recognizing the severe finished gasoline

10  shortage that would result from the events at the Torrance Refinery, beginning at least as early as

11  late February 2015, Vital and SK reached agreements with each other and with third parties as

12  part of their ongoing scheme to raise, fix, and manipulate the price of finished gasoline in

13  California by using various tactics. A core element of the scheme was manipulating the OPIS-

14  reported price during pricing windows for large contracts. The goal of the scheme was simple: to

15  drive up or stabilize the OPIS-reported price during pricing windows and to realize unlawfully

16  inflated profits while limiting bona fide market risk.

17      65.    Although tactics used by Vital and SK during the scheme varied and were often

18  complex, there were two primary components: (1) engage in trades that were reported to OPIS

19  for the purpose of inflating the OPIS-published price in the Spot Market Report and (2) execute

20  facilitating trades to hide or disguise the nature of the scheme, to limit or eliminate bona fide

21  market risk on the reported trades, and to share profits with each other.

22      **1.    OPIS-Reported Trades**

23      66.    As a core component in the scheme, Vitol and SK, through their employees

24  Niemann and Lucas, engaged in trades to move up or inflate the OPIS-reported price during the

25  pricing windows for large contracts. During these key date ranges, Defendants engaged in

26  selectively reported transactions and loss-leader transactions that were reported to OPIS to drive

27  up, stabilize, or arrest the decline of the OPIS-reported price. Sometimes they used the services

28  of an intermediary broker, and sometimes they transacted directly. Defendants also, at times,

1  made strategic bids to buy and offers to sell at prices calculated to impact the OPIS price

2  assessment.

3      67.    Many of the loss-leader transactions were "leveraged" because they involved

4  taking losses on the purchase of smaller quantities of gasoline to increase the profits on the sale

5  of larger quantities of gasoline or alkylate by artificially increasing the OPIS-reported price.

6  While the individual market-moving transactions were often uneconomic, Vitol and/or SK

7  realized a price increase on the larger floating price contracts (the leveraged side) that more than

8  made up for any losses on the smaller loss-leader transactions.

9      68.    These leveraged/loss-leader transactions could take different forms. One tactic

10 used by Defendants when trading Regular was to transact the high deal of the day when the deal

11 was reported to OPIS. This had the effect of bidding up the OPIS-reported price, as OPIS

12 reported purchases at increasingly higher prices. Sometimes, this deal was the absolute highest

13 deal of the day; other times, subsequent deals pushed the price even higher. By transacting the

14 high deals, Defendants moved up the average of the OPIS Spot Market Report and created the

15 impression to other market participants that there was strong demand, including demand at

16 higher than prevailing market prices.

17     69.    A similar tactic when trading Regular was to transact the first deal of the day at an

18 inflated price during key pricing windows so that OPIS would report an inflated purchase price

19 to other market participants. An early purchase at an inflated price signaled artificially high

20 demand, thereby discouraging would-be sellers from submitting offers to sell below that price.

21     70.    As described above, Premium traded far less often than Regular, and on many

22 days, no Premium deals at all were reported to OPIS. Accordingly, another tactic used was to

23 execute a market-spiking trade for Premium, which was reported to OPIS. Given the low volume

24 of Premium trades, a single Premium trade reported to OPIS could have a significant impact on

25 the spot market price. Although the trades might appear to have been uneconomical, Defendants

26 made them for Premium during the pricing windows for large sales of alkylate. While alkylate is

27 a key blending component for Premium, alkylate is not a separately reported commodity on

28 California's spot markets. Consequently, large floating price contracts for alkylate were most

commonly tied with a small differential to the OPIS-reported price for Premium during the associated pricing window. Therefore, to realize unlawfully inflated profits on alkylate contracts, Defendants conspired to inflate the price of Premium during key pricing periods.

71.     There were also scenarios, however, where Defendants conspired to inflate the price of Regular to advantage floating-price contracts for alkylate because those contracts were directly tied to the price of Regular or as part of a strategy to increase prices of both Regular and Premium, which often rise in tandem.

### 2.     Facilitating Trades

72.     As another component of their scheme, Defendants executed facilitating trades related to the OPIS-reported transactions referenced above. These facilitating trades were executed for various purposes, including to hide or disguise the nature of the scheme, to limit or eliminate bona fide market risk on the reported trades, and to share profits with each other. Facilitating trades were executed at the same time, before, or after the OPIS-reported trades. Vitol and SK executed these facilitating trades with each other and with third parties.

73.     For example, Defendants conducted a second trade in the opposite direction of the OPIS-reported trade. This type of round-trip or round-turn facilitating trade, sometimes called a "wash trade," effectively negated the volume of gasoline purportedly exchanged in the OPIS-reported trade.

74.     To hide the manipulative nature of the reported trade from OPIS and the wider market, often the facilitating trade was not reported to OPIS. The second trade ensured that no gasoline actually changed hands as a result of the OPIS-reported trade that inflated the price reported in the Spot Market Report.

75.     By moving in the opposite direction of the reported trade, the facilitating transaction ensured that there was little or no market risk associated with the reported transaction. Many of the facilitating trades—sometimes called "accommodation" or "prearranged" trades—appear to have been preplanned. The facilitating trades often had the effect of locking in a loss but also limiting the total exposure that Defendants faced as result of the reported transactions.

76.    The facilitating trades occurred before or after the reported trade. For example, prior to a pricing window, Vitol and/or SK took preplanned "short" positions, ensuring that they would need to buy during the pricing window. Therefore, when Defendants went on buying sprees that pushed up the OPIS-reported prices during the pricing windows, it would appear to other participants that there was an increase in demand, but in fact the demand was preplanned and artificial.

77.    Another facilitating tactic was to engage in unreported trades as a means of sharing profits from the scheme. In this way, Defendants entered into prearranged buy and sell contracts with each other, thereby transferring money rather than actual gasoline. These contracts often deviated from the prevailing market price and, therefore, were uneconomic.

78.    As a means of sharing profits and aligning incentives to artificially increase the market price, Vitol and SK also entered into contracts with each other designed to share in the unlawfully inflated profits earned from manipulating the floating price contracts. These agreements were called "Joint Ventures" or "JVs." However, they were nothing more than secret agreements between the Defendants to facilitate their scheme.

### 3.    The Vitol and SK Agreements Expand to Include Alkylate

79.    Although the conspiracy between Vitol and SK began with Regular gasoline in late 2014 and then expanded to include Premium in February 2015, at some point in mid- to late-2015, Vitol and SK expanded their so-called "Joint Ventures" to include alkylate cargoes. Under the alkylate agreement, Vitol or SK imported a cargo of alkylate and then conspired to boost the profits from selling the alkylate while seeking to conceal the conspiracy.

80.    The agreement to share the profits of the alkylate cargoes was a crucial component of the scheme. As discussed above, Defendants engaged in market-spiking trades during the pricing windows for large sales of alkylate. Therefore, when Vitol and SK shared the profits from the alkylate cargoes, it aligned their incentives to inflate the OPIS-reported prices during the pricing window for that alkylate.

## VIII.   THE UNLAWFUL SCHEME HARMED CALIFORNIA CONSUMERS

81.     Defendants were effective in carrying out their scheme. During key pricing windows, they artificially moved and inflated the price of Regular and Premium.

82.     In the most egregious examples, Defendants manipulated Regular and Premium prices so effectively that those prices moved higher or stayed higher to a degree that is nearly inexplicable when compared to the supply and demand fundamentals prevailing at the time of the pricing windows.

83.     Defendants' manipulation of the gasoline markets harmed consumers because the spot market price translates to the "rack" market prices, which are the wholesale prices paid when a gasoline tanker truck is filled up. Inflated rack market prices then directly translate into inflated prices in the retail market and ultimately into the price paid at the service station pump.

84.     The following chart, published by Severin Borenstein, chair of the PMAC—which was formed to investigate gasoline pricing in California between late 2014 and the end of 2016—depicts the historically unprecedented change in gasoline pricing in California that was caused by, and lingered, as a result of Defendants' conduct: [2]

---

[2] See "California's Mystery Gasoline Surcharge Continues," Energy Institute at HAAS, *available at* https://energyathaas.wordpress.com/2018/02/26/californias-mystery-gasoline-surchargecontinues/.





85.   Consistent with the above, the following chart reveals erratic pricing around the time of the Torrance Refinery explosion for weekly gas prices in Los Angeles:[3]



[3]Data provided by U.S. Energy Information Administration, *available at* https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=EMM_EPM0_PTE_Y05LA_D PG&f=W.

86.     Similarly, the following chart demonstrates inflated gasoline prices in California compared to the rest of the United States beginning around the time of the Torrance Refinery explosion:[4]



87.     A 2017 report explains that after the explosion, prices went up, "[b]ut when the Torrance refinery came back online, a funny thing happened: prices came down, but not to their previous level. For some reason, California gasoline now costs about 57 cents more than the national average."[5]

88.     The spot market price spikes were not explained by any actual decrease in gasoline production following the Torrance Refinery explosion. As the PMAC's Final Report explained, "Energy Commission staff noted that while the ESP tower and FCCU of the refinery remained offline until June 2016, the refinery could still create finished gasoline from processed blending components, some of which may be imported."[6]

---

[4] *See* "Chart of the Day: California's Mysteriously High Gasoline Prices," Mother Jones, *available at* https://www.motherjones.com/kevin-drum/2017/11/chart-of-the-day-californias-mysteriously-high-gasoline-prices/.

[5] *Id*.

[6] *See* "Petroleum Market Advisory Committee Final Report," California Energy Commission, *available at* https://ww2.energy.ca.gov/business_meetings/2017_packets/2017-09-13/Item_01a.pdf, at p. 12.

89.     In fact, the PMAC demonstrated that overall gasoline production in California was well within the historical five-year production band immediately following the Torrance Refinery explosion and for the remainder of 2015, as depicted in the following chart:[7]



90.     The following chart demonstrates that Defendants' spot price manipulation, which was in full swing not later than February 2015, impacted CARBOB spot prices in both San Francisco and Los Angeles, whose markets move in tandem:[8]

---

[7] *Id.*

[8] *See* "Data on California Gasoline Price Margins," California Energy Commission, *available at* https://www.energy.ca.gov/sites/default/files/2019-05/Data_on_California_Gasoline_Price_Margins.pdf, at p. 5.



91.     Spot price manipulation affects gasoline prices at all retail outlets, whether they supply branded or unbranded gasoline (i.e. gas sold by retail discounters like Arco, Safeway, and Costco). In fact, the PMAC demonstrated that prices for branded and unbranded gasoline move in tandem, with branded pricing slightly higher than unbranded pricing.[9]

---

[9] *See* "Petroleum Market Advisory Committee Final Report," California Energy Commission, *available at* https://ww2.energy.ca.gov/business_meetings/2017_packets/2017-09-13/Item_01a.pdf at p. 29.



Figure 15: Average Retail California Regular Gasoline Prices by Branded and Unbranded Retail Sectors, 2007 to 2016

92.    Furthermore, the harm to consumers was not limited to the pricing windows. The repeated exercise of inflating the spot market price over time had residual impacts on the spot market prices even outside of the pricing windows specified in the contracts. Thus, the unlawful agreements and spot market manipulation applied throughout the California gasoline market such that consumers paid more than they should have at retail gas stations.

93.    Vitol and SK both reaped extraordinary and unlawfully inflated profits off the backs of purchasers of gasoline in California, which was foreseeable, as California trading generated millions of dollars of profits per month; Lucas of Vitol and Niemann of SK personally shared in this windfall.

94.    While the precise end date of the scheme is not yet known, the illegal conduct continued into 2016. The scheme likely terminated at or around the time that Niemann left SK in late 2016.

## IX.    CALIFORNIA ATTORNEY GENERAL COMPLAINT

95.    On May 4, 2020, the California Attorney General filed suit in San Francisco Superior Court, alleging the same manipulation of the gasoline spot market in California.

96.    The suit followed on the heels of a non-public investigation into the causes of gasoline prices following the Torrance Refinery explosion. That investigation uncovered secret

1  evidence that Defendants had illegally colluded with each other and third parties to increase the

2  price of gasoline to levels above what competition would have allowed.

3  **X.     PLAINTIFFS' CLAIMS ARE TIMELY**

4          97.     Plaintiffs' Cartwright Act and Unfair Competition Law claims are both subject to

5  a four-year statute of limitations. However, for several reasons, Plaintiffs' claims are timely.

6          **A.     Tolling**

7          98.     The California Attorney General, as representative of the people of the State of

8  California, obtained tolling agreements with Defendants that are applicable to the claims of

9  Plaintiffs and the Class, in whole or in part. These tolling agreements have effective dates of

10  August 3, 2018, and March 8, 2019, respectively. Defendants and the California Attorney

11  General subsequently executed additional tolling agreements to extend the termination dates of

12  the tolling periods specified in the original agreements. These termination dates have not passed

13  as of the filing of this Complaint.

14          **B.     Fraudulent Concealment**

15          99.     Throughout the relevant period, Defendants affirmatively and fraudulently

16  concealed their unlawful conduct.

17          100.    For example, Lucas affirmatively mislead the California Energy Commission

18  ("CEC") about the true cause of high prices for gasoline that followed the Torrance Refinery

19  explosion in February 2015. On August 16, 2016, he told the PMAC, including Kathleen Foote,

20  Senior Assistant Attorney General and Chief of the Antitrust Division, that high gasoline prices

21  were caused by a lack of transparency by ExxonMobil, rather than Defendants' illegal

22  manipulation of spot market prices. Lucas stated:

23          So you know, last year we brought in quite a few cargos into L.A., both alkaloid
            (phonetic) and finish CARBOB that went through Kinder Morgan's system and
24          sold direct to Exxon and some other refiners. You know, one of the big things that
            this whole conversation has entailed is about the high prices. One of the reasons
25          why, in my opinion, was the lack of transparency with what was going on with
            Torrance. Because if you remember when it first blew up back in February, there
26          was like an eternal rolling one-month period where they were going to get back
            up and running. And they kept saying next month, next month, next month. So the
27          trading companies in general, it takes four to five weeks to ship a cargo out, if
            Exxon is coming back up they're not going to ship into closed ARB. So because
28

there was no real timeline of when Exxon was going to come back up and running, we would generally not—you don't put cargos on the water and ship them to the West Coast just on a punt, basically, hoping that you can sell them when they get there. That's what happened with that one cargo that was done by another trading company who sent it out there, at which point in time the market had collapsed, and so he was unable to sell it, and so he sailed it away again. So that's what happened with that one. So if there was more transparency with what was going on with refinery maintenance, when it was going to come back up, it would have allowed us to see if it was more—if we were going to be able to land these cargos and actually into a competitive market. If Exxon is back up and running the market is going to fall dramatically. So basically kind of that lack of information kept cargos at bay. There were still a lot shipped into the West Coast, but not as many as could have been or would have been done. If we had actually known that Exxon was going to be down for over a year there would have been a much bigger import play over that time frame.[10]

101.    Defendants also misled OPIS about the true nature of their trading activities by reporting artificially high spot trades directly or indirectly between them, while at the same time concealing the wash trades that reduced any market risk in the primary trade.

102.    Neither Plaintiffs, nor members of the Class, had actual or constructive knowledge of the facts supporting their claims for relief despite diligence in trying to discover the pertinent facts. Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of Defendants' scheme, or any facts that might have led to the discovery of the scheme, any earlier than May 4, 2020.

103.    Plaintiffs could not have discovered these violations earlier in time because Defendants conducted their scheme in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

104.    Defendants engaged in an unlawful market manipulation scheme, which they affirmatively concealed by, among other things, engaging in trades that were reported to OPIS to artificially inflate the OPIS-reported benchmark price (published in OPIS's Spot Market Report) without revealing that Defendants were parties to the trade, and then executing related trades that

---

[10] *See* Petroleum Market Advisory Committee, Transcript, August 16, 2016 Meeting, *available at* https://www.energy.ca.gov/data-reports/planning-and-forecasting/petroleum-market-advisory-committee, at pp. 129:24-131:10.

were not reported to OPIS to disguise the nature of their scheme, to limit potential losses on reported trades, and to share profits with one another. This scheme was, by its very nature, self-concealing. As a result of the fraudulent concealment of the scheme, Plaintiffs assert the tolling of the statute of limitations otherwise applicable to Plaintiffs' claims.

## XI.   CLASS ACTION ALLEGATIONS

105.   Plaintiffs brings this action on behalf of themselves and all others similarly situated as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class:

> All persons or entities that purchased gasoline within the State of California from November 1, 2014 through December 31, 2016 (the "Class Period").

106.   The following persons and entities are excluded from the above-described proposed Class:

(a)   Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates;

(b)   All governmental entities;

(c)   All Counsel of Record; and

(d)   The Court, Court personnel, and any member of their immediate families.

107.   Members of the Class are so numerous and dispersed that joinder of all members of the Class is impracticable. Plaintiffs do not know the exact number of Class members but, on information and belief, allege that there are millions of Class members throughout California.

108.   Plaintiffs' claims are typical of the claims of members of the Class. Plaintiffs and members of the Class were harmed by the same wrongful conduct by Defendants in that they paid artificially inflated prices for gas as a result of Defendant's unlawful conduct and were deprived of the benefits of competition.

109.   Plaintiffs will fairly and adequately protect and represent the interests of members of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of members of the Class.

110.     Plaintiffs are represented by counsel with experience in the prosecution of complex class action antitrust litigation.

111.     Questions of law and fact common to members of the Class predominate over questions that may affect only individual members of the Class because Defendants have acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

112.     Questions of law and fact common to the Class include:

(a)     Whether Defendants contracted, combined or conspired with one another to restrain trade in the spot market for gasoline at any time during the Class Period;

(b)     Whether Defendants' conduct caused the prices of gasoline in California to be higher than the competitive level as a result of their restraint of trade;

(c)     Whether Plaintiffs and the other members of the Class were injured by Defendants' conduct and, if so, the determination of the appropriate classwide measure of damages; and

(d)     Whether Plaintiffs and other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

113.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practically be pursued individually, substantially outweighs potential difficulties in management of this class action.

114.     Plaintiffs know of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

**FIRST CAUSE OF ACTION**

**Violation of the Cartwright Act**
**(California Business and Professions Code section 16720 et seq.)**

115.    Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein. Plaintiffs bring this claim against all Defendants.

116.    Beginning at a time presently unknown to Plaintiffs, but at least in or around November 1, 2014, and continuing at least through the end of 2016, Defendants entered into and engaged in an unlawful trust in restraint of trade and commerce, as described above, in violation of California Business and Professions Code section 16720 et seq. ("Section 16720").

117.    This scheme consisted, without limitation, of a continuing agreement, understanding, or conceding of action among Defendants, the substantial terms of which were to fix, maintain, control, increase, inflate, tamper with, or otherwise manipulate and make artificial the benchmark prices of Regular and Premium that OPIS published in its Spot Market Report to market participants. At all relevant times, Defendants were competitors in this market.

118.    For the purpose of forming and effectuating the unlawful trust, Defendants:

- Engaged in trades with each other and with third parties that were reported to OPIS for the purpose of fixing, maintaining, controlling, increasing, inflating, tampering with, or otherwise manipulating and making artificial, the benchmark prices of Regular and Premium published in OPIS's Spot Market Report in order to profit on other OPIS-based positions Defendants maintained;

- Executed facilitating trades to hide or disguise the nature of their market manipulation scheme, to limit or eliminate bona fide market risk on the reported trades, and to share ill-gotten profits amongst themselves; and

- Entered into anticompetitive agreements with each other.

119.    The scheme has had, among other things, the following effects:

- Affected the value of contracts for Regular, Premium, and alkylate that were based on artificially inflated benchmark prices;

- Suppressed competition among Defendants for the purchase and sale of Regular, Premium, and alkylate; and

- Affected the wholesale and retail market prices for Regular and Premium in California, which are based on and affected by California spot market prices.

120.    Defendants' scheme constitutes a per se violation of Section 16720.

121.    Defendants' scheme was carried out and effectuated within the State of California and the resulting impact on California's spot, wholesale, and retail markets for finished gasoline, caused by Defendants' unlawful conduct, injured natural persons in this State.

122.    As a result of Defendants' violations of Section 16720, Plaintiffs and members of the Class were injured in their business and property in that they paid more for gasoline in California than they would have in the absence of Defendants' unlawful conduct.

123.    Accordingly, Plaintiffs bring this class action pursuant to California Business and Professions Code section 16750(a) and seek, on behalf of themselves and members of the Class, treble damages and injunctive relief.

## SECOND CAUSE OF ACTION

### Violation of the Unfair Competition Law
### (California Business and Professions Code section 17200 et seq.)

124.    The Complaint incorporates by reference and reallege the preceding as though fully set forth herein. Plaintiffs bring this claim against all Defendants.

125.    Beginning at a time presently unknown to Plaintiffs, but at least in or around November 1, 2014, and continuing through 2016, Defendants committed acts of unfair competition, a described above, in violation of California Business and Professions Code section 17200 (hereafter "Section 17200").

126.    Defendants' unlawful, unfair, or fraudulent business acts or practices, as described above, constitute unfair competition within the meaning of Section 17200, and include, without limitation, the following:

- Violating Section 16720, as set forth above;

- Engaging in wash sales, accommodation trades, prearranged trades, and transactions made for the purpose of manipulating the benchmark prices reported on the California gasoline spot market, all in violation of California's commodities fraud statute (Corp. Code, §§ 29535, 29536, 29537, 29538) and the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

127.    As a result of Defendants' violations of Section 17200, Plaintiffs and members of the Class were injured in their business and property in that they paid more for gasoline in

California than they would have in the absence of Defendants' unlawful, unfair, or fraudulent conduct.

128.     Accordingly, Plaintiffs bring this action pursuant to California Business and Professions Code section 17200, on behalf of itself and members of the Class, and seek injunctive relief and restitution pursuant to California Business and Professions Code section 17203.

## XII.   PRAYER FOR RELIEF

129.     WHEREFORE, Plaintiffs request that the Court enter judgment on their behalf and on behalf of members of the Class defined herein, by adjudging and decreeing that:

A.     Defendants' contracts, agreements, or combination constitutes an illegal restraint of trade in violation of the Cartwright Act, section 16720 et seq. of the Business and Professions Code;

B.     Defendants' acts violate the Unfair Competition Law, section 17200 et seq. of the Business and Professions Code;

C.     Plaintiffs and members of the Class have been injured in their business and property as a result of Defendants' violations;

D.     Plaintiffs and members of the Class are entitled to recover trebled damages and/or restitution, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against Defendants in an amount subject to proof at trial;

E.     Plaintiffs and members of the Class be awarded pre- and post-judgment interest, and that the interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.     Plaintiffs and members of the Class are entitled to equitable relief by which the Court enters all orders necessary to prevent Defendants, as well as Defendants' successors, agents, representatives, employees, and all persons who act in concert with Defendants from engaging in any act or practice that constitutes a violation of the Cartwright Act, section 16720 et seq. of the Business and Professions Code or the Unfair Competition Law,

section 17200 et seq. of the Business and Professions Code, including such mandatory injunctions as may be reasonably necessary to restore and preserve fair competition;

    G. Plaintiffs recover their costs and reasonable attorneys' fees; and

    H. Plaintiffs and members of the Class receive any other legal and equitable relief as the Court may deem just and proper, including such other relief as the Court may deem proper to redress, and prevent recurrence of, the alleged violation in order to dissipate the anticompetitive effects of Defendants' violations, and to restore competition.

## XIII. JURY TRIAL DEMAND

  130. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the claims asserted in this Complaint that are so triable.

DATED: May 26, 2020                  Respectfully submitted,


                                     */s/ Whitney E. Street*

                                     Whitney E. Street (CA Bar No. 223870)
                                     **BLOCK & LEVITON LLP**
                                     100 Pine Street, Suite 1250
                                     San Francisco, CA 94111
                                     Tel.: (415) 968-1852
                                     Fax: (617) 507-6020
                                     wstreet@blockesq.com

                                     Gregory S. Asciolla (*pro hac vice application
                                     forthcoming*)
                                     Karin E. Garvey (*pro hac vice application forthcoming*)
                                     Domenico Minerva (*pro hac vice application
                                     forthcoming*)
                                     Robin A. van der Meulen (*pro hac vice application
                                     forthcoming*)
                                     Ethan H. Kaminsky (*pro hac vice application
                                     forthcoming*)
                                     **LABATON SUCHAROW LLP**
                                     140 Broadway
                                     New York, NY 10005
                                     Tel: (212) 907-0700
                                     Fax: (212) 818-0477
                                     gasciolla@labaton.com
                                     kgarvey@labaton.com
                                     dminerva@labaton.com
                                     rvandermeulen@labaton.com
                                     ekaminsky@labaton.com

                                     *Attorneys for Plaintiffs*